THE PEOPLE OF PUERTO RICO, Plaintiff, *v.* CENTRAL
CAMBALACHE, Defendant.

No. 3. Argued June 20, 1943.—Decided November 5, 1943.

*Jaime Sifre* and *F. M. Susoni* for defendant. *Miguel Guerra Mondragón* for the Land Authority. *Francisco A. Arrillaga,* Special Legal Adviser of the Land Authority. *Mariano Acosta Velarde,* and *Luis E. Dubón, Félix Ochoteco, Jr.,* and *B. Sánchez Castaño,* for the Bar Association of Puerto Rico, as *amici curiae.*

MR. JUSTICE DE JESÚS delivered the opinion of the court.

Central Cambalache and the Land Authority of Puerto Rico have been unable to agree as to which of them is entitled to select and which of them is bound to pay the fees of the notary who is to draw the deed of sale which pursuant to the consent decree rendered in this case on March 6, 1942, must be executed by the former in favor of the latter. The Land Authority alleges that it proposes (1) to require that said deed be drawn by one of the attorneys of the Land Authority now practicing the notarial profession; (2) to have such an attorney and notary collect from the vendor full notarial fees; (3) to cover the amount of said fees into the general funds of the Land Authority; and (4) not to allow to the notary drawing the said deed other compensation than the salary which he is receiving as attorney of the Land Authority.

Central Cambalache on the contrary maintains that the Land Authority of Puerto Rico is not entitled to carry out such purposes:

(1) Because that government agency can not practice the notarial profession;

(2) Because the compromise sale herein is of a compulsory nature in so far as the Central is concerned and, therefore, it must be governed for all legal purposes by the provisions of §1345 of the Civil Code, in virtue of which the Central is entitled to receive the reasonable value of its property without any deduction which might render the compensation unfair;

(3) Because, even if the provisions of §1344 of said code were applicable to this compromise, said Section does not entitle the Central to select the notary nor to collect the notarial fees, since the selection of the notary concerns the vendor and the collection of the fees concerns the notary.

Inasmuch as subdivision 12 of the decree provides that this court shall retain jurisdiction of the cause for the issuance of any subsequent order or orders which may be necessary, both parties submitted to us the matter in controversy, and several *amici curiae* intervened.

█ The first question to be decided is which of the two parties to a contract of sale is entitled to select the notary.

Our statutes contain no provision determining which of the parties to a contract of sale is entitled to said selection. But as Laurent says: "To refuse to render judgment when the law is not clear or precise would really amount to a denial of justice, and it would produce disorder in society." To the same result would lead, in civil cases, of course, a refusal to render judgment when there is no statute applicable to the case. In order to remedy such a situation, §7 of our Civil Code provides:

"Section 7.—Any court which shall refuse to render a decision on the pretext of silence, obscurity or unintelligibility of the laws, or for any other reason, shall be held liable therefor.

"When there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration.[1]

---

[1] In Argentina this matter is regulated by §16 of the Civil Code, which says:

"If a civil question can not be decided either by the language or by the spirit of a law, the principles of similar statutes shall be applied; and if there is still any doubt, the question shall be decided by applying the general principles of law, taking into account the circumstances of each case."

It is worth noting that the second paragraph of the above-quoted Section differs from the corresponding one of §6 of the Spanish Civil Code, which says:

"When there is no statute exactly applicable to the point in controversy, the custom of the place shall be applied, and, in the absence thereof, the general principles of law."

The Spanish code, in the absence of a statute exactly applicable, makes available to the judge only two sources from which the omission may be supplied: first, the custom of the place, and then, only in the absence thereof, the general principles of law. Our code, instead, introduced a novelty in providing that when there is no statute applicable to the case, the judge in his decision shall take into consideration the element of natural justice, in accordance with the general principles of law and the accepted and established usages and customs. The aggregate of these three elements is designated by our code as "equity." The discretion vested in the Puerto Rican judge is unquestionably greater than that granted to the Spanish judge, since the latter is bound to apply, without further considerations, the custom of the place and, only in the absence thereof, the general principles of law. These general principles of law, as has been held by the Supreme Court of Spain, are those set forth in the decisions of said court or those which may be found in the old Spanish codes, and the judge is not allowed to apply rules taken from other systems of law, no matter how correct and just they may be. In this connection, F. Clemente de Diego in his recent work "Instituciones de Derecho Civil Español," vol. 1, p. 100, says:

"We think that the Spanish lawmaker when invoking the principles of law, had in mind those of the Spanish law or those which he had already used in drafting the rules of the code and which were not thereby exhausted. For that reason, following the example set by the Italian lawmaker, he did not use, as the Austrian legislator did, the words 'principle of natural law,' but only 'general principles of law.'"

534

But inasmuch as the Puerto Rican lawmaker deemed it advisable to modify the second paragraph of §6 of the Spanish Code, by changing it in the form which we have already pointed out, we are not bound by the decisions of the Supreme Court of Spain and the opinions of commentators of that code construing the above-cited paragraph. Without undervaluing the learning contained in the Spanish codes, we are free to resort also to sound principles which, although borrowed from other systems of law, without destroying the symmetry of the legal edifice, may be applied to present local conditions and are not in conflict with the existing laws. This has been the practice of this court and of the Supreme Court of the Philippine Islands, despite the fact that in said islands the Spanish Civil Code was literally adopted. *United States* v. *Cuna,* 12 Phil. Rep. 241; *Arnedo* v. *Llorente and Liongson,* 18 Phil. Rep. 257.

Regarding "the custom of the place," the Supreme Court of Spain has held that in order that it may be applied in the absence of statute, it is necessary that the same be proved, and that it is not enough to assume it as of course, without any evidence in support thereof. In this connection, F. Clemente de Diego in his work already cited, volume 1, pp. 96, 97, states that ever since the time of the glosators, custom has been considered as a simple fact and, as such, it must be proved in court by him who alleges it, and he cites the judgments of the Supreme Court of Spain of October 8, 1877, January 29 and June 26, 1899, and November 8, 1911. Manresa also regards it as a sound doctrine. 1 *Comentarios al Código Civil Español,* p. 79. The Supreme Court of the Philippines applied the said doctrine in the case of *Patriarca* v. *Orate,* 7 Phil. Rep. 390. The same rule prevails in the common law. *Unkovitch et al.* v. *New York Cent. R. Co. et al.,* (N. J., 1934) 16 Atl. (2d) 558.

In the present case, "the usages and customs" have not been proved; hence, we must disregard that element for the

purpose of stating the rule applicable herein. Let us resort, then, to reason, as embodied in the general principles of law.

It is unquestionable that both the vendor and the purchaser have an interest in the selection of the notary; but no effort is required to realize that the degree of interest of the purchaser is necessarily greater than that of the vendor. The latter receives from the purchaser the purchase price in legal currency. The former, the purchaser, although he receives the actual possession of the thing purchased, the title to the property, through ignorance, negligence, or malice on the part of the notary, may be wholly or partially subject to a fatal defect, and in consequence thereof, he may fail to actually receive what he lawfully paid for. In Argentina, whose civil code, like that of Spain and our own code, contains no provision regarding the question now discussed, it has been held that it is incumbent on the purchaser, not the vendor, to designate the notary (*escribano*) who is to certify the deed. This right of the purchaser is considered to be so important that it has been held that, even though the notices for a public sale contain the designation of a notary, it is the purchaser who is entitled to designate the one who must draw the deed. *Código Civil de Argentina*, annotated by Dr. Daniel Antokoletz, volume 1, p. 412.

In our opinion, in "equity," we must hold that, except as otherwise agreed upon and in the absence of usages and customs to the contrary, it is the purchaser and not the vendor who is entitled to select the notary.[2]

(2)F. Clemente de Diego, op. cit., at p. 103, says: "Now, as in the latter (he is referring to law and custom) there exist hietuses which must be supplied somehow, and as the general principles to which resort must be had, in the absence of a statute or custom, have not been established and it is necessary to adduce and state them, *on that assumption the intervention of the courts approaches very near to legislative enactment, and the jurisprudence almost merges with the formal and direct sources of the law.* Thus the decisions of the courts may beget new forms of law, either by way of custom, or by exerting influence upon the lawmaker in order that the latter may incorporate its doctrines in the statutes." (Parenthetical matter and italics supplied.)

If, as we have just held, the Land Authority of Puerto Rico, as purchaser, is the one entitled to select the notary in the instant case, is there any legal obstacle precluding that government agency from requiring that the deed be drawn by one of its attorneys duly qualified to practice the notarial profession? In Puerto Rico the notary is a professional. It is so regarded by our Notarial Law.[3] Indeed, our notaries receive no appointment. In order to be able to practice, it is sufficient for them to have been admitted to practice as attorneys by this court and to comply with the requisites provided by §§2 and 5 of the Notarial Law. As attorneys, they may practice all over the Island, their number is unlimited, or rather, it is equal to the number of attorneys admitted to practice who comply with the aforesaid requisites; and upon their ceasing to act as such notaries by reason of death or for any other reason, no vacancy is created which must be filled by the appointing authority. It might be argued that the Puerto Rican notary in authenticating contracts and other extrajudicial acts, and in taking affidavits, exercises a public function. This is so, indeed, but the mere fact that he exercises a public function and takes the oath required of him by law does not make him a public officer. The members of the grand jury also exercise a public function and take the required oath, yet, despite the recognized public function discharged by them,

---

Compare the foregoing views of the Spanish jurist with those of Mr. Justice Holmes, set forth in his dissenting opinion in *Southern Pacific Co.* v. *Jensen*, 244 U.S. 205, 221, thus:

"I recognize without hesitation that judges do and must legislate, but they can do so only intersititially; . . ."

(3) Section 2 of the Act to regulate the practice of the notarial profession in Puerto Rico in its pertinent part provides:

"Sec. 2.—In addition to those now practicing *the notarial profession* in Porto Rico, and such as have heretofore secured a certificate issued by the Supreme Court of Porto Rico, only lawyers admitted to practice before the courts of justice by the Supreme Court of Porto Rico and who have given bond in favor of the people of Porto Rico in the sum of two thousand five hundred dollars, for the faithful discharge of the duties of the office, shall hereafter be allowed to practice *said profession.*"

it has been held in various jurisdictions that they are not public officers. *State* v. *Graham,* 60 S. E. 431; *State* v. *Bradley,* 48 Conn. 535; *McDuffie* v. *Perkerson,* 91 A.L.R. 1002. Nor does the fact that a notary furnishes a bond to secure his functions, imply that he is a public officer; for, as stated by Fernández Casado in his *"Tratado de Notaría,"* the state when imparting to a notarial instrument the character of an authentic document is perfectly entitled to take the proper measures which will serve as a guarantee for the parties thereto.

The Notarial Law which was in force in this Island until repealed by the present "Act to regulate the practice of the notarial profession in Puerto Rico," of March 8, 1906, was the same Spanish Law "Regarding the constitution of the notarial profession," enacted on May 28, 1862, which, with slight modifications was extended to Cuba and Puerto Rico on October 28, 1873. According to said Spanish law, notaries were appointed by the Crown (§11); and were chosen by competitive examinations before the *Audiencias,* which submitted to the government the names of the three candidates deemed by them to be best qualified (§12); they had to furnish a bond (§14); they took an oath of obedience and loyalty to the King, and to uphold the constitution and the laws and to faithfully and properly discharge their duties (§15); the duties of the office of notary were incompatible with any other office remunerated with a salary out of the general, provincial, or municipal budgets (§16); and, lastly, it was provided by §3 that each judicial district would constitute a notarial district, within which there should be created *the number of notarial offices considered necessary* for the public service, taking into consideration the population, the frequency and facility of transactions, etc.

Notwithstanding the fact that the Spanish notary fulfilled all the essential requisites which would render him a public officer under our laws in force, under the Spanish law he

was regarded as a professional and not as a public officer. It is so maintained by the Spanish textwriter Miguel Fernández Casado in his work previously cited, volume 1, pp. 23, 24, and by Mr. Ruiz Gómez, who was quoted with approval by the former at page 143 of his said work.

In the United States a notary is properly considered a public officer. There the creation of the office, the procedure for his appointment, the number of notaries for each county, the territorial limits of the districts within which they may practice, the term of office, the vacancies and manner of filling them, and the powers of the officers are provided by law. See Thompson's Laws of New York, 1939, Part 1, pages 1016–1017; Deering, Political Code of California, 1937, §§791–801; 4 Dart, Louisiana General Statutes, §6285 et seq.

Since the notary is regarded as a professional in Puerto Rico, his status as an employee of the Land Authority is the same as that of any other technician of that government agency and we are not aware of any law which expressly or by implication prevents the Land Authority from designating one of its attorneys authorized to practice the notarial profession, to draft and certify the deed. On the contrary, The Land Law of Puerto Rico (Laws of 1941, p. 400), under the caption "General Powers and Faculties of the Authority," §8 (p), confers upon it, among others, the following powers:

"To appoint such officers, agents, and employees, vest them with such powers, *impose on them such duties,* and fix, change, and pay them such compensation for their services, as the Authority may determine." (Italics ours.)

In accordance with the above provision, the Authority may impose on any of its officers, legally qualified therefor, as a part of his official duties that of drafting and certifying during working hours those public instruments in which it may be lawfully interested.

Who may the Land Authority trust more than its officers or employees, especially in the case of a transaction which involves a sum in excess of $1,000,000? It is true that this court has held that it is immoral and illegal for a public officer to practice for his own benefit the profession of law during office hours which he is legally bound to devote entirely to the discharge of his official duties. *Rodríguez v. Mudafor*, 50 P.R.R. 816. It is also true that that prohibition is applicable to a notary as well as to any other professional similarly situated. But the case herein is distinct. Here the work is to be done by the notary under instructions and for the benefit of the Land Authority from which he receives compensation as its employee or officer.

█ It is true that §39 of the "Act to regulate the practice of the notarial profession in Puerto Rico" contains a schedule fixing the compensation to be received by a notary for his services. The amounts so fixed do not constitute fees belonging to the state, of which the latter might not be deprived. Nor can they be considered as salaries belonging to a public officer of which he might not be deprived, for, as we have seen, a notary in Puerto Rico is not a public officer, but a professional. Said schedule only fixes the compensation which may be charged by a notary for his services. But the notary whom the Executive Director of the Land Authority proposes to use is one of the officers or employees of that government agency, whose assigned duties, by direction of said Executive Director, include that of drafting and certifying during office hours public instruments embodying transactions to which the Authority may be a party or in which it may be lawfully interested. As compensation for his services, said officer receives the salary assigned to him by the Authority and he can not, of course, legally receive any additional compensation, just as any other attorney of said agency would be precluded from receiving it while be-

ing charged with the duty of studying any legal question in which the Authority might be lawfully interested. Cf. *Coggeshall* v. *Conner*, 39 L.R.A. (N. S.) 81.

The case of *Wilcox* v. *Banco Popular*, (C.C.A. 1918) 255 Fed. 442, is inapposite. There a mortgage deed executed in favor of the bank before a notary who was its president and at the same time an important stockholder in the banking institution, was declared void. The decision was based on the fact that the notary had such a pecuniary interest in the transaction as to disqualify him from acting. Really the notary and the bank were so identified in interest that they were virtually the same. But in the present case the officer of the Land Authority has no pecuniary interest whatever in the transactions which that government agency may carry out pursuant to the purposes for which it was created.

 It having been settled that the notary in the present case is not entitled to charge any fees for said notarial work, he being an officer or employee of the Land Authority, it will be readily seen that he can not assign them to the Authority; for no one can assign anything that he does not own; nor can the Authority be subrogated to the rights of the notary, as it is legally impossible to be subrogated to rights which are nonexistent. Consequently, the Authority, in demanding the payment of said fees must necessarily do so on its own behalf and not as a right acquired from the notary. But, in our judgment, it is clear that the Land Authority can not in its own right receive those fees. It would amount to acknowledge in favor of that government agency the right to practice the notarial profession, in open violation of §2 of the Act to regulate the practice of the notarial profession in Puerto Rico. See the notes in 73 A.L.R. 1327 and 105 A.R.R. 1364.

 Moreover, it is settled that government officers or agencies can not collect from the public other fees or charges than those fixed by law. We are not aware of any legal pro-

vision in force in Puerto Rico authorizing the Land Authority to charge fees for services of this sort. But assuming that the absence of a legal prohibition to that effect might be interpreted as granting the power to charge them, even so it could not collect them in the absence of an express or implied authority to charge this particular kind of fees, for, as we have seen, this is precluded by the notarial law in force.

For the foregoing reasons it must be held:

(1) That the Land Authority of Puerto Rico, as purchaser in this case, is entitled to select the notary who is to draw the deed of sale, which notary may be one of the employees or officers of the said Authority; and

(2) That neither the notary so selected from among the officers or employees of the Authority, nor the Authority itself, may charge any fees for said notarial work.

MR. JUSTICE SNYDER, dissenting.

I concur in the opinion and order of the court in this case, except that I am of the opinion that the fees earned by a notary in the performance of his duties as an officer or employee of the Land Authority should be covered into the general funds of the Authority. I am not impressed by the argument that no statute expressly authorizes the collection of these fees. We have held in this case that, in performing the functions described in the majority opinion, the notary involved would be acting properly as a notary. Having so held, I am unable to see how we can stop short and say that, although such an employee is acting properly under the statute regulating notaries, the fees he has earned, although not waived, cannot be collected. I readily agree that the notary, who is being paid a salary as a public official or employee, cannot receive these fees in addition to his salary (*Rodríguez v. Mudafor*, 50 P.P.R. 816.) But I find nothing in the statute requiring us to grant to a vendor

of land to the Authority the windfall of exemption from the fees provided by law in connection with such a transaction.

I regard it as highly significant that these are fees which a vendor to a private party would otherwise be clearly required to pay and which, roughly speaking, merely reimburse the Authority for salaries paid to notaries for such services.

The practice of covering such fees into the public Treasury has been assailed as immoral. I can see no such immorality. Counsel asserted, without contradiction, that this is the universal practice in the many acquisitions of land in Puerto Rico by various Federal agencies. Registrars' fees, which we have held are fees for services rendered and not taxes (*The R. F. C. Mortgage Co.* v. *Registrar,* 60 P.R.R. 230), are, by virtue of statute, covered into the insular Treasury. In the same way, fees charged to litigants by clerks of Federal Courts and United States Attorneys are paid by these officials into the public Treasury (Title 28, U.S.C.A., §541 *et seq.*). The argument therefore reduces itself to an assertion that the immorality flows, not from the collection by the Government of the fees as such, but from the absence of a specific statutory provision therefor. The majority opinion contains an excellent discussion of the necessity for decision by the courts of matters not covered by statute. I fully agree with this principle, and believe it applicable to the problem under discussion. But, to me, the equities herein clearly favor the Authority. I therefore feel that if we must legislate judicially in this case, we should take the position that the fees are collectible by the Authority because no statute prohibits it rather than to hold, as the majority holds, that there is no statute authorizing the practice.

It is my candid opinion that since this matter is now being expressly raised for the first time, vendors of land to government agencies will insist in the future that the matter be covered specifically by contract. However, the holding of the majority has foreclosed the government from us-

ing this point, as they had every right to do in the past, as a part of their bargaining power, to insist either that the fees be paid and be covered into the public treasury or, in the event of waiver of the fees, that such waiver be reflected in the purchase price of the land.

The figures cited to us whereby some small vendors of land to the Puerto Rico Reconstruction Administration were compelled to pay in fees ten per cent of the value of the land sold may well have been an onerous burden on such vendors. But I know no reason why any government agency cannot as a part of its contracting power waive all or part of such fees. On the other hand, to insist that such waiver shall obtain inexorably in every instance as a matter of law, would in most cases, as in the instant case, result only in a windfall to the vendor.

Representations have been made to us in the course of the argument that our decision in this case might have some effect on the fees of notaries performing similar services on a salary basis for private institutions or law firms. As I interpret the majority opinion, that question is left open. I express no view on it, as I do not feel it is involved in the case before us.